UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| RICK ROEGLIN, Individually and On Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. |
| ) | CLASS ACTION |
| Plaintiff, ) ) | DEMAND FOR JURY TRIAL |
| vs. ) ) | |
| GENESCO INC., HAL N. PENNINGTON, ROBERT J. DENNIS, JAMES S. GULMI and JONATHAN D. CAPLAN, ) ) ) ) | |
| ) | |
| Defendants ) ) ) | |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION AND OVERVIEW

1. This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of Genesco Inc. ("Genesco" or the "Company") common stock between April 20, 2007 and November 26, 2007 (the "Class Period"), who were damaged thereby (the "Class").

2. Genesco is a retailer of branded footwear, licensed and branded headwear, and a wholesaler of branded footwear. The Company's businesses include the design or sourcing, marketing and distribution of footwear. The Company is headquartered in Nashville, Tennessee.

3. During the Class Period, defendants made false and misleading statements concerning Genesco's business. In fact, during the Class Period, Genesco's business was not as healthy as defendants represented. As a result of their representations, Genesco was an attractive acquisition target for Foot Locker, Inc. ("Foot Locker"). Foot Locker ultimately made an offer and The Finish Line, Inc. and Headwind, Inc., a wholly owned subsidiary of Finish Line (collectively "Finish Line"), subsequently made an increased offer, based on Genesco's purported success. When the truth about Genesco's results began to be revealed, however, Finish Line indicated it would no longer pursue the acquisition.

4. Then, on November 26, 2007, Genesco received a subpoena from the Office of the U.S. Attorney for the Southern District of New York seeking documents related to its merger agreement and in connection with alleged violations of federal fraud statutes.

5. On this news, Genesco's stock plunged to $25.44 per share on November 27, 2007, almost a 16% drop from the closing price of $30.17 on November 26, 2007, on volume of 2.4 million shares. This decrease in Genesco's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

6.     In fact, during the Class Period, defendants concealed the following information, which caused their statements to be materially false and misleading:

(a)     The Company's stores were not performing well and would not produce the financial results being forecast for the Company

(b)     The Journeys stores were performing poorly relative to plan with big same store sales declines

(c)     These poor results would be considered adverse events to potential acquirors, leading to significant share price declines at Genesco.

## JURISDICTION AND VENUE

7.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Genesco has operations in this District and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

8     Plaintiff Rick Roeglin purchased Genesco common stock during the Class Period as set forth in the attached certification and was damaged thereby.

9.     Defendant Genesco is a retailer of branded footwear, licensed and branded headwear, and a wholesaler of branded footwear. The Company's businesses include the design or sourcing, marketing and distribution of footwear. Genesco is headquartered in Nashville, Tennessee.

10.     Defendant Hal N. Pennington ("Pennington") is, and at all relevant times was, Chairman of the Board and Chief Executive Officer ("CEO") of the Company.

11.     Defendant Robert J. Dennis ("Dennis") is, and at all relevant times was, President and Chief Operating Officer ("COO") of the Company.

12      Defendant James S. Gulmi ("Gulmi") is, and at all relevant times was, Senior Vice President, Finance and Chief Financial Officer ("CFO") of the Company.

13.     Defendant Jonathan D. Caplan ("Caplan") is, and at all relevant times was, Senior Vice President of Genesco, and CEO of the Branded Group and President of Johnston & Murphy, a subsidiary of Genesco

14.     The defendants named in ¶¶10-13 are referred to herein as the "Individual Defendants."

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

15.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Genesco. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Genesco common stock was a success, as it: (i) deceived the investing public regarding Genesco's prospects and business; (ii) artificially inflated the price of Genesco common stock; and (iii) caused plaintiff and other members of the Class to purchase Genesco common stock at inflated prices.

## BACKGROUND

16.     Genesco engages in the retail of footwear and licensed and branded headwear, and the wholesale of footwear primarily in the United States. The Company operates Journeys, Journeys Kidz, and Shi by Journeys retail stores that offer footwear for young men and women and children; Underground Station and Jarman retail stores, which sell footwear and accessories primarily for men and women; Hat World, Lids, Hat Shack, Hat Zone, Head Quarters, Cap Connection, and Lids Kids retail stores, which offer an assortment of headwear for college, MLB, NBA, NFL and NHL teams, as well as other specialty fashion categories; and Johnston & Murphy stores, which sell footwear and accessories for men

17      In a move to promote a merger agreement with another company, Genesco misrepresented demand for its products and the performance of its stores. These false statements

about Genesco's business were extremely important to the market and made Genesco an attractive

acquisition target.

## FALSE AND MISLEADING
## STATEMENTS PRIOR TO THE CLASS PERIOD

18.     On March 19, 2007, *Reuters* reported in part:

Foot Locker Inc., the world's largest retailer of athletic shoes and apparel, is preparing a takeover bid for rival Genesco Inc. to expand into the hat business, an industry publication reported on Monday.

New York-based Foot Locker, which itself had been the subject of buyout speculation for much of last year, is preparing a tender offer for Genesco in the $44-to-$46-per-share range, but could go as high as $48, Women's Wear Daily reported.

Genesco, which operates the Journeys, Lids and Underground Station chains, saw its shares rise more than 8 percent in early New York Stock Exchange trading.

\*          \*          \*

The attraction for Foot Locker is Genesco's strong presence in the hat business, WWD reported.

Foot Locker has previously said it would open a chain of athletic hat stores called "Champs Sports Just Hats" to try to take market share from Genesco's Hat World chain. At the time, an analyst said the hat business had operating profit margins of 12 percent to 13 percent, higher than the average for specialty retail.

19.     On March 19, 2007, *Bloomberg* reported in part:

Shares of footwear retailer Genesco Inc. rose 7.6 percent after a trade journal reported a potential hostile bid of as much as $48 a share from Foot Locker Inc., the largest U.S. athletic-shoe seller.

\*          \*          \*

"The Journeys division and the Hat World division would be very synergistic . . . ." Investors "would be rewarded" if a bidding war were to erupt.

\*          \*          \*

"Strategically, these two companies make a good fit, but I don't think Genesco is for sale," John Rouleau, an analyst at Wachovia Securities, said in an interview.

20.     On April 4, 2007, Foot Locker's CEO and Chairman, Matthew Serra ("Serra"), made

a proposal to Pennington in an April 4 letter, which stated in part:

Dear Hal:

As we have discussed previously, we have long admired and respected Genesco Inc. and what you and your team have accomplished. Through its differentiated retail banners, its multi-channel approach and its effective merchandising strategy, Genesco has performed very well.

As we have stated publicly, Foot Locker, Inc. is actively seeking to acquire strong operators in the specialty footwear retailing arena. A combination with Genesco would clearly be consistent with this strategy. Over the past several months, our executive management team, Board of Directors, and advisors have devoted significant time and effort to analyzing the potential strategic benefits of combining our two companies. We concluded that a merger of our companies would enable both of us to benefit from mutual best practices, enhance our ability to serve our customers, and provide our employees and management teams with increased opportunities.

Based on publicly available information, we would be prepared to acquire all the outstanding stock of Genesco for a consideration of $46.00 per share in cash. We believe this proposal provides compelling value for Genesco's shareholders in that it represents:

- A significant premium above Genesco's all-time high stock price;
- A premium of 26 percent to Genesco's average trading pricing during the past year;
- An implied multiple of enterprise value to LTM EBITDA of 7.7x, which compares favorably to the current trading multiples of comparable specialty footwear and apparel retailers.

This proposal has the unanimous support of our executive management team and our Board of Directors. Moreover, this proposal would not be subject to any financing condition, as we have sufficient sources of financing available.

We have engaged Lehman Brothers as our strategic advisor and Skadden, Arps, Slate, Meagher & Flom LLP as our legal counsel. We and they are prepared to devote substantial resources toward ensuring an expedited process and the negotiation of a definitive agreement. Prior to the execution of such an agreement, we would expect to perform certain selected confirmatory due diligence. We believe this focused and concise review along with discussions with key Genesco personnel can be concluded within a very short period of time.

Our proposal is submitted to you on a confidential basis. We hope that Genesco and its representatives will not publicly disclose this proposal so that our discussions can be held in confidence. This letter is not intended to be, and is not, a definitive agreement between us or in any way binding upon Foot Locker or Genesco, but is intended to express our indication of interest as of the date hereof. As stated, it is further subject to the completion of due diligence and the negotiation and

execution of a mutually acceptable merger agreement The parties will be bound only in accordance with such definitive agreement, if and when executed

We would welcome the opportunity to meet with you to discuss this opportunity further. I look forward to speaking with you again soon.

21      On April 19, 2007, Serra sent a follow-up letter to Pennington, as follows:

Dear Hal:

We are disappointed not yet to have received a substantive reply to my letter to you of April 4, 2007. In that letter, which followed contacts between us over the past several months, we stated that, based on publicly available information, we would be prepared to acquire all the outstanding stock of Genesco, Inc for a consideration of $46 per share in cash, and we continue to be willing to proceed on that basis As noted in our April 4 letter, this represented a premium of 26 percent to Genesco's average trading price during the past year. As you know, the recent rise in Genesco's stock price has been affected by speculation regarding a possible sale of the company.

We believe that a price of $46 per share represents significant value for Genesco's shareholders We would welcome the opportunity to conduct selected due diligence, following which we may be prepared to increase our offer if increased value can be demonstrated.

Given Genesco's failure to provide a substantive response to my April 4 letter and recent public speculation, we thought it would be best for both of our organizations, and our respective shareholders, to make our position public. We therefore plan to release publicly a copy of this letter, as well as our letter to you of April 4, before the market opens tomorrow morning

This letter is not intended to be, and is not, a definitive agreement between us or in any way binding upon Foot Locker or Genesco, but is intended to express our indication of interest as of the date hereof It is further subject to the completion of due diligence, and the negotiation and execution of a mutually acceptable merger agreement The parties will be bound only in accordance with such definitive agreement, if and when executed

We continue to believe it would be in the best interests of Genesco's shareholders if we were able to have substantive discussions with you concerning a combination of our two companies I look forward to speaking with you soon.

## FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

22.     On April 20, 2007, Genesco issued a statement confirming an "unsolicited" proposal

from Foot Locker that stated in part:

Genesco Inc. confirmed today that it has received an unsolicited proposal from Foot Locker, Inc. to purchase all of Genesco's outstanding shares for $46 per share in cash. The nonbinding proposal is subject to due diligence and other conditions. The Company's Board of Directors intends to consider the proposal, with the assistance of its financial advisor, Goldman, Sachs & Co., and expects to respond in due course.

23. On April 23, 2007, Pennington issued a letter to Foot Locker, which stated in part:

Our Board reviewed the proposed set forth in your letter of April 4, 2007. As part of the evaluation of your proposal, our financial advisors from Goldman Sachs carefully analyzed the proposal and other alternatives for creating shareholder value, including continuing as a strong, independent public company. Based upon their advice, and with the assistance of our legal advisors from Bass, Berry & Sims PLC, our Board unanimously rejected your $46.00 per share cash proposal.

... Further, I note that when you called to inform me of your April 4 letter, you said, "Of course we can go higher."

24. On this news, Genesco's stock increase from $40.88 per share a week earlier to above

$50 per share. Defendants concealed from Foot Locker and the market that Genesco's business was

not nearly as strong as the market had been led to believe.

25. Subsequently, on April 23, 2007, Genesco issued a press release in response to the

proposed acquisition by Foot Locker that stated in part:

After careful consideration, the Board of Directors, in consultation with its financial advisor, Goldman, Sachs & Co., and with the assistance of its legal advisor, Bass, Berry & Sims PLC, unanimously determined that the $46.00 per share cash proposal is not in the best interests of the Company's shareholders.

"Our Board unanimously rejected the proposal and concluded that it did not reflect the long-term value of Genesco, including its strong market position and future growth prospects," said Hal N. Pennington, Chairman and Chief Executive Officer of Genesco Inc.

26. On May 17, 2007, Genesco issued a press release entitled "Genesco Announces Plans

To Close Underperforming Urban Stores – Revises First Quarter Fiscal 2008 Guidance." The press

release stated in part:

Genesco Inc. today announced plans to close or convert up to 57 underperforming stores, primarily in the Underground Station Group. The 57 targeted stores also include up to 8 urban stores in the Hat World Group. The Company also said it has revised its previously announced earnings outlook for the first quarter ended May 5, 2007.

The Company said that it expects its earnings for the first quarter ended May 5, 2007, to reflect fixed asset impairment non cash pretax charges of $6.2 million to $7 million primarily relating to stores included in the plan, or $0.14 to $0.16 per diluted share. The Company also expects to incur pretax charges of $14 million to $15 million (or $0.32 to $0.34 per diluted share) for additional asset write downs, lease terminations, and other costs related to the planned store closings over the next 18 months, primarily in the current fiscal year, subject to its ability to negotiate acceptable lease terminations. The stores targeted for closure in the plan had an aggregate pre-tax operating loss of $4.9 million and sales of approximately $22 million for the 12 fiscal months ended May 5, 2007.

Due to the expected impairment charges, weaker than expected retail operating results, a slightly higher than expected effective tax rate, and professional and other expenses incurred in connection with an unsolicited acquisition proposal by Foot Locker, Inc., the Company has revised its previously announced earnings outlook for the first quarter ended May 5, 2007. The Company said it now expects to report earnings in the range of $0.09 to $0.12 per diluted share for the quarter compared to the original guidance of $0.28 per share. The revised guidance reflects an expected shortfall of $0.01 to $0.02 per share related to operating performance compared to the original guidance, asset impairment charges of $0.14 to $0.16 per share and approximately $0.01 per share of incremental income tax expense and unplanned costs incurred in connection with the Foot Locker proposal.

"We remain confident that Underground Station is a viable concept filling an underserved niche in the market," said Genesco Chairman and Chief Executive Officer Hal N. Pennington. "We believe that closing these stores will allow us to focus on strengthening the remaining stores and improve the prospects for a quicker turnaround in the Underground Station business."

The Company said that it expects to report same store sales growth of approximately 3% for the Journeys Group and 4% for Johnston & Murphy retail, and same store decreases of approximately -4% for the Hat World Group and -22% for the Underground Station Group for the quarter.

27      On May 31, 2007, Genesco issued a press release entitled "Genesco Announces

Review of Strategic Alternatives; Company Reports Receipt and Rejection of Acquisition Proposal

at $51 Per Share," which stated in part:

Genesco Inc. announced today that its Board of Directors has authorized the Company and its advisors to explore strategic alternatives which maximize shareholder value, including a possible sale of the Company.

The Company also noted that last Thursday it received a conditional proposal from Foot Locker, Inc. to acquire all the Company's outstanding common stock for $51.00 per share in cash, subject to due diligence. In consultation with its financial advisor, Goldman Sachs & Co., the Board of Directors considered the proposal and,

following a thorough review, unanimously rejected the proposal having concluded that it was not in the best interests of the Company's shareholders.

The Board of Directors of Genesco invited Foot Locker to participate in the Company's process on the same terms as other interested parties to date, but Foot Locker has declined to do so.

Going forward, the Board of Directors will work together with the Company's management team and its legal and financial advisors to evaluate the Company's available alternatives and determine the course of action it believes is in the best interests of all its shareholders.

In making the announcement, the Company stated that there can be no assurance that the exploration of strategic alternatives will result in any transaction. The Company undertakes no obligation to make any further announcements regarding the exploration of strategic alternatives unless and until a final decision is made.

Goldman, Sachs & Co. is acting as financial advisor to Genesco and Bass, Berry & Sims PLC is acting as legal advisor.

28. Subsequently on May 31, 2007, the Company reported its first quarter fiscal 2008

financial results in a release that stated in part:

Genesco Inc. today reported earnings before discontinued operations of $2.2 million, or $0.10 per diluted share, for the first quarter ended May 5, 2007, including primarily non-cash, pretax fixed asset impairment charges of $6.6 million, or $0.15 per diluted share, primarily related to the Company's previously announced plan to close up to 57 underperforming stores in urban markets. For the quarter ended April 29, 2006, earnings before discontinued operations were $10.7 million, or $0.41 per diluted share. Net sales for the first quarter of fiscal 2008 increased 6% to $335 million, compared to $315 million for the first quarter of fiscal 2007.

Genesco Chairman and Chief Executive Officer Hal N. Pennington said, "During the first quarter the Journeys Group posted solid sales growth and the positive momentum in the Johnston & Murphy and Dockers Footwear businesses continued. Hat World's business improved consistently throughout the quarter, with the successful transition to the new Major League Baseball on-field hat. However, the challenges in the urban market were once again a negative factor in our overall results for the quarter.

"As we previously announced, we plan to close or convert up to 57 underperforming urban stores, primarily in the Underground Station Group, that have been most negatively impacted by the downturn in that market. We remain confident that Underground Station is a viable concept and believe that closing these stores will provide us with a stronger platform on which to rebuild and improve that business.

"Net sales in the Journeys Group increased 10% to approximately $156 million and same store sales rose 3% in the first quarter, with a 7% increase in comparable footwear unit sales, which strengthens our confidence in our merchandising position for the summer and back to school season. Journeys' store growth plans remain on track, as we continue to target 50 to 60 new stores for fiscal 2008

"Net sales at Journeys Kidz increased 35% to $11 million, same store sales rose 6% and comparable footwear unit sales were up 11% during the quarter. We continue to work toward a target of 40 new Kidz stores this fiscal year. We opened 11 new Shi by Journeys stores during the first quarter and ended the period with 23 Shi by Journeys stores in operation. Our target is to have 50 Shi stores open by the end of the fiscal year

"Net sales in the Hat World Group increased 12% to approximately $79 million and same store sales declined 4%, compared to a decline of less than 1% in the first quarter last year. As expected, Hat World continued to be affected by the difficult urban market. Additionally, the quarter saw the planned transition to the new Major League Baseball on-field hat. This transition hurt sales early in the quarter, but the introduction of the new hat at the beginning of April sparked a positive sales trend that has continued into the second quarter. Based on both our positioning in the market and moderating comparisons, we expect an improving sales trend at Hat World through the balance of the year. We expect to open 100 to 105 new stores in the Hat World Group in Fiscal 2008

"Net sales for the Underground Station Group, which includes the remaining Jarman stores, were $30 million and same store sales declined 22%. The weak urban market, ongoing softness in the athletic category and a tough Nike comparison negatively affected sales comparisons during the quarter. We expect improvements at Underground Station in the latter part of the year, as we continue to re-merchandise the stores towards more women's and casual products, as the absence of Nike products becomes a less significant factor in the year-over-year comparisons, and as overall comparisons moderate as we mark the anniversary of the onset of the urban market downturn.

"Johnston & Murphy Group's net sales increased 5% to approximately $46 million in the first quarter. Wholesale sales rose 3%, same store sales for the shops were up 3% and operating margin increased 330 basis points to 9.7%. Johnston & Murphy's footwear line continues to gain customer acceptance. At the same time, we continue to see strength in all our non-footwear categories. Johnston & Murphy's momentum remains strong.

"First quarter sales of Licensed Brands increased 25% to approximately $24 million, after a 37% gain for the same period last year. According to The NPD Group's Retail Tracking Service, Dockers Footwear was the #1 ranked brand for men's dress casual footwear in national chains and shoe chains for the 12 months ended March 2007."

The Company also updated its guidance for the fiscal year ending February 2, 2008. It now expects to report net sales of $1.59 billion and earnings per diluted share of $2.37 to $2.40 for fiscal 2008, including charges of $0.35 related to the store closing program. The Company's fiscal 2008 guidance does not include the impact of any costs associated with the Company's review of strategic alternatives, which the Company announced today.

29.    On June 18, 2007, Finish Line and Genesco issued a press release entitled "Finish

Line to Acquire Genesco Creating Leading $2.8 Billion Retailer; Transaction Provides The Finish

Line with Increased Scale, Diversification and New Growth Opportunities." The press release stated

in part:

> The Finish Line, Inc. and Genesco Inc. today announced that the Boards of Directors of both companies have unanimously approved a definitive merger agreement under which The Finish Line will acquire all of the outstanding common shares of Genesco for $54.50 per share in cash. The total transaction value is approximately $1.5 billion. The offer price represents a premium of 37.7% over Genesco's three-month average undisturbed stock price ended March 9, 2007. The transaction is expected to be completed in Fall 2007. The Finish Line expects the transaction to be accretive to its net income, before consideration of incremental amortization resulting from the transaction, in the first full year after closing.
>
> The transaction enhances The Finish Line's position as a leading footwear and apparel retailer. With Genesco, The Finish Line will have strong market positions across multiple footwear and apparel categories, including athletic, sport casual, lifestyle, brown shoe and headwear. The combined company's portfolio of retail concepts will include Finish Line, Man Alive and Paiva as well as Journeys, Journeys Kids, Shi by Journeys, Underground Station, Jarman, Johnston & Murphy, Hat World, Lids, Hat Shack, Hat Zone, Head Quarters, Cap Connection and Lids Kids. In addition, the combined company's licensed and wholesale footwear and apparel business will include Johnston & Murphy and licensed brands.
>
> "This is a compelling strategic transaction that affords exciting opportunities to our shareholders, business partners and employees," said Alan H. Cohen, Chief Executive Officer of The Finish Line. "With Genesco, we will enhance our strength in athletics and gain an immediate presence in new and growing retail categories to further diversify our business and deepen our vendor relationships. We believe the increased scale achieved through our combination will better enable us to drive strong returns in this competitive retail environment.
>
> "We have great admiration for the Genesco team and their proven record of identifying and capitalizing on new consumer trends. Their long-term success in operating under different retail banners and their industry-leading merchandising strategies will strongly complement our own initiatives," continued Mr. Cohen "The Finish Line and Genesco share a heritage of superior service, dedication to employees and a culture of creativity. Through this combination, we ensure that these

characteristics that have long distinguished our companies will continue We welcome Genesco's management and employees to The Finish Line and are confident that they will be an important part of the combined company's success."

"Following a review of our strategic alternatives, we believe that this combination is in the best interests of our shareholders. We have long admired The Finish Line's entrepreneurial spirit, and believe that together we will be able to leverage the combined companies' scale and talents," said Genesco's Chief Executive Officer, Hal N Pennington. "In addition, Genesco and The Finish Line share similar philosophies that promote a strong team culture and the spirit of creativity. These value systems, which have long distinguished our companies, will continue to define the next chapter of our history together."

## Benefits of the Transaction

- **Increased Scale**. On a pro forma basis, the combined company had revenues of approximately $2.8 billion, based on the twelve months trailing as of May 31, 2007. In addition, The Finish Line will have expanded platforms for future growth with 2,870 retail stores throughout the United States, Canada and Puerto Rico

- **New Growth Opportunities**. Already a leader in athletic footwear and apparel with its Finish Line stores, the transaction adds growing retail concepts to The Finish Line's portfolio. These include Journeys, which offers the most trend-relevant footwear and accessories for young adults, Hat World, the leading mall-based retailer of the latest team and fashion headwear, and Johnston and Murphy, the premier lifestyle brand for men. The Finish Line will also gain a presence in the growing branded and licensed wholesale business, as well as the recently launched concepts of Shi by Journeys and Lids Kids

- **Broad Portfolio of Retail Businesses**. As a result of the combined company's multiple retail concepts and more extensive product offerings across footwear and apparel categories, The Finish Line will be able to satisfy a wider spectrum of consumers and their needs.

- **Cost Savings and Operational Efficiencies** The transaction is expected to generate approximately $15 million to $20 million in annual cost savings beginning in the first full year of operations, including integration costs, from shared administrative services, increased scale in purchasing, marketing and advertising, and sourcing and logistics efficiencies. This transaction is about growth, and The Finish Line does not expect significant changes to the workforce.

## Financing

The Finish Line expects the transaction to be funded through a combination of approximately $11 million in cash on hand and up to $1.6 billion in financing pursuant to a commitment provided by UBS Securities LLC, consisting of a Revolving Credit Facility, a Senior Secured Term Loan and a Senior Bridge Facility. Following the transaction, The Finish Line believes its strong cash flow from operations will allow it to reduce its net debt and fully fund its growth initiatives.

*     *     *

**Advisors**

UBS Securities LLC served as financial advisor to the Board of Directors of The Finish Line in connection with the transaction. Peter J. Solomon Company also provided financial advisory services to the Finish Line Board, and Gibson, Dunn & Crutcher LLP is legal counsel. Goldman, Sachs & Co. served as financial advisor to Genesco, and Bass, Berry & Sims PLC is legal counsel.

30     On June 18, 2007, Genesco filed a Form 8-K with the SEC announcing an Agreement

and Plan of Merger (the "Merger Agreement") with Finish Line that stated in part:

> At the effective time of the Merger (the "Effective Time"), each outstanding share of common stock, par value $1.00 per share, of the Company (including the associated preferred stock purchase rights granted pursuant to the Company's shareholder rights plan, "Common Stock"), other than shares owned by the Company, Merger Sub or by Finish Line, will be cancelled and converted into the right to receive $54.50 in cash, without interest. At the Effective Time, the vesting of each outstanding option will be accelerated in full, and each such option will be cancelled and converted into the right to receive in cash, without interest and less applicable withholding taxes, equal to the product of (a) the excess of $54.50 over the exercise price per share of Common Stock for such option and (b) the number of shares of Common Stock then subject to such option. Additionally, all restricted shares under the Company's equity plans will be vested in full immediately prior to the Effective Time.

*     *     *

> Pursuant to the Merger Agreement, the Company is subject to a "no shop" restriction on its ability to solicit third-party proposals, provide information and engage in discussions with third parties relating to alternative business combination transactions. The no-shop provision is subject to a "fiduciary-out" provision that allows the Company, prior to obtaining shareholder approval of the Merger, to provide information and participate in discussions with respect to a third party proposal that its board of directors (1) determines in good faith, after consultation with advisors, is a "superior proposal," as defined in the Merger Agreement, and (2) determines that its failure to pursue (by furnishing information or engaging in discussions) would be inconsistent with its fiduciary duties.

> The Merger Agreement may be terminated upon certain circumstances, including if the Company's Board of Directors determines in good faith that it has received a superior proposal and otherwise complies with certain terms of the Merger Agreement. The Merger Agreement provides that, upon the termination of the Merger Agreement, under specified circumstances, the Company will be required to pay Finish Line, as sole remedy in such circumstances, a termination fee of $46 million and up to $10 million of documented expenses and fees (including reasonable attorneys' fees) incurred by Finish Line. Additionally, in the event the Company's

shareholders do not approve the Merger at the special meeting of shareholders convened for the purposes of considering the Merger Agreement, the Company will be required to reimburse up to $10 million of documented expenses and fees (including reasonable attorneys' fees) incurred by Finish Line

Finish Line has obtained customary debt financing commitments for the transactions contemplated by the Merger Agreement, the aggregate proceeds of which are expected to be, when added with other sources of capital available to Finish Line, sufficient for Finish Line to pay the aggregate Merger consideration as well as all other fees and expenses associated with the transactions contemplated by the Merger Agreement. The conditions provided in the debt financing commitment letter are generally tied to the closing conditions in the Merger Agreement being satisfied, including that there have occurred no "Company Material Adverse Effect," as defined in the Merger Agreement, and certain other limited representations and customary conditions. Consummation of the Merger is not subject to a financing condition

The Merger Agreement contains customary representations and covenants, and the Merger is subject to customary closing conditions, including approval of the Merger by the Company's shareholders and expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The parties currently expect to close the transaction during the Fall of 2007

31.     When the Company reported this news, shares of Genesco increased from $49.60 per

share to $53.75 per share.

32      On August 30, 2007, Genesco reported its second quarter fiscal 2008 financial results

in a release that stated in part:

Genesco Inc. today reported a loss before discontinued operations of $2.9 million, or $0.13 per diluted share, for the second quarter ended August 4, 2007. Results for the quarter included $5.5 million pretax, or approximately $0.13 per diluted share, in expenses related to the Company's proposed merger with a subsidiary of The Finish Line Inc., retail store asset impairment charges and costs related to the previously announced decision to close certain underperforming stores, primarily in the Underground Station Group. For the second quarter ended July 29, 2006, earnings before discontinued operations were $5.9 million, or $0.24 per diluted share. Net sales for the second quarter of fiscal 2008 increased 8% to $328 million, compared to $304 million for the second quarter of fiscal 2007

Genesco Chairman and Chief Executive Officer Hal N. Pennington said, "Our second quarter results were affected by the combination of a later start to back-to-school, later sales tax holidays in Texas and Florida and a generally challenging retail environment, especially in footwear. While back-to-school season is still in progress, we are encouraged by the improving trend in sales for the third quarter to date

"Net sales in the Journeys Group increased 8% to approximately $148 million in the second quarter, while same store sales declined 7%. The shift in sales tax holidays in Texas and Florida from the second quarter last year to the third quarter this year had an especially pronounced effect on the Journeys Group, since approximately 16% of Journeys stores are located in those two states. Journeys' same store sales in Texas and Florida decreased 13% and 20%, respectively, in the quarter. We expect the Journeys business for the balance of the year to benefit from the later back-to-school and tax holiday sales and from more pronounced competitive merchandising advantages in the fall and holiday seasons, and are pleased with the week-to-week improvement in comparable sales thus far in the quarter: Journeys Group's same store sales have improved from 10% decline in the first week in August, to a 3% increase in the second week, to a 9% increase for the week most recently ended, for a 1% increase for the month to date.

\*       \*       \*

"Net sales for the Underground Station Group, which includes the remaining Jarman stores, were $25 million, and same store sales declined 23%, in line with our expectations for the quarter. Same store sales again reflected the weak urban market, a difficult Nike comparison, and continued softness in the athletic category. Additionally, the tax holiday shift exacerbated the comparison, as 21% of Underground Station stores are located in Texas and Florida. For the first three weeks of August, same store sales in the Underground Station Group declined 20%. We expect Underground Station to benefit in the second half from new merchandising strategies for the fall and from easier comparisons with last year, as Nike's significance to last year's sales progressively diminishes and overall comparisons moderate.

33.     Following the issuance of these results, Finish Line issued its own press release:

"The Company is disappointed with Genesco's second quarter fiscal 2008 financial results. Consistent with its responsibilities to The Finish Line's shareholders, the Company is evaluating its options in accordance with the terms of the merger agreement. The Company does not intend to make further comments at this time."

34.     On this news that Genesco's results were so disappointing that Finish Line was rethinking the acquisition, Genesco's stock dropped from $50.10 per share to $44.95 per share on volume of 6.6 million shares.

35.     On September 17, 2007, at a special meeting of shareholders held by Genesco, shareholders voted in favor of the proposed merger agreement.

36.     On September 19, 2007, Pennington issued a letter to Alan H. Cohen, Chairman of the Board and CEO of Finish Line, that stated in part:

Dear Alan:

I am writing this letter to respond to Gary's letter of September 17 as well as to set forth our view of what The Finish Line needs to do to move toward closing.

First, let me reiterate that combining our businesses makes great strategic sense. Our team still looks forward to joining with yours.

On an ongoing basis, we have routinely shared detailed financial and operational information with The Finish Line and with UBS, and have responded promptly to numerous requests for specific information. We understand that you need certain information in order to be able to obtain the financing that you need to consummate the transaction, and there are detailed provisions in the Merger Agreement that provide how that cooperative process works. Clearly, UBS' most recent request comes within neither the spirit nor letter of our agreement. It is clear from their own statements that they are looking for a way out of their commitment – in our view, not because of Genesco's results but because the upheaval in the credit markets makes this deal less profitable for them. We are not going to allow the litigation consulting firm they have hired to go on a fishing expedition. We will, however, continue to provide both The Finish Line and UBS with information related to Genesco in accordance with the detailed processes set forth in the Merger Agreement. As you know, as recently as yesterday, we provided additional information required by UBS for inclusion in your offering memorandum.

The Merger Agreement generally provides that the closing of the merger shall be on a date no later than the second business day after the closing conditions to the merger have been satisfied. Our shareholders met Monday and voted overwhelmingly in favor of the transaction and we have satisfied all our conditions to closing. However, both The Finish Line and UBS have continually failed to meet deadlines that they established for their own actions relative to obtaining the financing to consummate the transaction. Consequently, Genesco hereby makes the following demands:

*     that The Finish Line immediately consummate the merger with Genesco; and

*     that The Finish Line immediately deliver a substantially completed draft offering memorandum relating to its proposed financing to UBS; that UBS confirm that such substantially completed draft offering memorandum complies with the terms of the Commitment Letter; that The Finish Line immediately schedule presentations to the rating agencies for the purpose of obtaining expedited ratings of The Finish Line's securities; and that The Finish Line enforce all its rights under the Commitment Letter.

I am sure you can appreciate the obligation we have to our shareholders to ensure that The Finish Line complies with its obligations under the Merger Agreement. Alan, I understand that your probable response is going to be to send me a long letter drafted by your lawyers telling me why you can't do the things we have demanded or why you need more time or why things are out of your control. Before you make that response, I encourage you to think about your obligations under the

Merger Agreement, to think about the risks to your Company if you fail to comply with your obligations under the Merger Agreement, and whether you are going to continue to stall us or proceed to enforce your rights against UBS under the Commitment Letter. I look forward to hearing from you and working with you to expeditiously consummate the transaction.

37. Then, on September 21, 2007, Genesco issued a release entitled "Genesco Files Lawsuit Against The Finish Line Seeking Specific Performance of Merger Agreement," which stated in part:

Genesco Inc. announced today that it has filed suit in Chancery Court in Nashville, Tennessee, seeking an order requiring The Finish Line, Inc. to consummate its merger with Genesco and to enforce The Finish Line's rights against UBS under the Commitment Letter for financing the transaction.

Commenting on the filing, Genesco Chairman and Chief Executive Officer Hal N. Pennington said, "No more delays by The Finish Line and UBS; no more reservation of rights; no more bankers' putting their pencils down. We want a court of competent jurisdiction to enforce our rights under the Merger Agreement and for The Finish Line and UBS to live up to their obligations."

Pennington continued, "We have launched this litigation in an effort to speed consummation of the merger and to force impartial review of the aspersions that The Finish Line and its bankers have cast on Genesco's business and reputation. I, along with other members of the management team and our Board of Directors, are proud to be the stewards of a company that is a leader and innovator in its industry with a rich history dating to 1924. I am proud to be the leader of a group of employees who have helped build a wonderful business for the benefit of our shareholders."

Robert V. Dale, the presiding independent director of Genesco's Board of Directors, said, "Our Board of Directors stands united in this call for The Finish Line and UBS to perform their obligations and pay our shareholders $54.50 per share in cash. Our Board, our management team and our advisors are confident that the steps we are taking are in the best interests of our shareholders."

Pennington concluded, "Commencing litigation is always a difficult decision, but continued delay by The Finish Line and UBS is simply not acceptable. Accordingly, we are seeking expedited hearings on all of our claims. I caution our shareholders and employees that there will likely be claims made back against Genesco. When they come, we will be ready."

38. On November 15, 2007, UBS, Finish Line's bank, filed a suit against Finish Line and Genesco seeking permission from a Tennessee court to be relieved of its obligation to fund the transaction and "walk away" from Genesco. Additionally, in court documents, UBS noted

Genesco's unexpected second-quarter loss and Finish Line's earnings difficulties "make it unlikely that the merged company will generate enough cash to pay its debt and could become insolvent." UBS has sued Genesco for fraud, stating that Genesco "was not honest in disclosing the company's financial information."

39.     On November 16, 2007, Genesco responded to UBS's counterclaim, in a release that stated in part:

> Hal N. Pennington, Chairman and Chief Executive Officer of Genesco Inc., responded today to the filing of a counterclaim by UBS against Genesco. "For 46 years, I have been privileged to work with a wonderful group of people, in a business that I love, for the benefit of our shareholders. Today, my management team and I have been accused of defrauding UBS. On behalf of our company, our management team and our employees, I categorically deny those claims."
>
>    Mr. Pennington continued, "It is sad when a major international financial institution resorts to this sort of mudslinging in an attempt to get out of its contractual obligations and survive the meltdown in the credit markets. To our customers, our suppliers, our shareholders and, most importantly, our employees, I assure you of my commitment to continue to operate Genesco with the same high standards of integrity that have made me proud to be a part of this company throughout my career. We will also continue to act in the best interest of our shareholders, including enforcing our rights under our Merger Agreement with The Finish Line."

40.     Then, on November 26, 2007, Genesco received a subpoena from the Office of the U.S. Attorney for the Southern District of New York seeking documents related to its merger agreement and in connection with alleged violations of federal fraud statutes.

41.     On this news, Genesco's stock plunged to $25.44 per share on November 27, 2007, almost a 16% drop from the closing price of $30.17 on November 26, 2007, on volume of 2.4 million shares. This decrease in Genesco's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

42.     In fact, during the Class Period, defendants concealed the following information which caused their statements to be materially false and misleading:

(a)     The Company's stores were not performing well and would not produce the financial results being forecast for the Company.

(b)    The Journeys stores were performing poorly relative to plan with big same store sales declines.

(c)    These poor results would be considered adverse events to potential acquirors, leading to significant share price declines at Genesco.

## LOSS CAUSATION/ECONOMIC LOSS

43.    During the Class Period, as detailed herein, defendants made false and misleading statements by means of concealment of Genesco's problems with poor performing stores and slowing demand and engaged in a scheme to deceive the market. This artificially inflated Genesco's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Genesco's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Genesco stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i e*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

44.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Genesco stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts

45.     At all relevant times, the market for Genesco stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Genesco filed periodic public reports with the SEC; and

(b)     Genesco regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

46      Plaintiff incorporates ¶¶1-45 by reference.

47.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Genesco common stock during the Class Period.

49.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Genesco common stock. Plaintiff and the Class would not have purchased Genesco common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

50.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Genesco common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

51.    Plaintiff incorporates ¶¶1-50 by reference.

52.    The Individual Defendants acted as controlling persons of Genesco within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Genesco, the Individual Defendants had the power and ability to control the actions of Genesco and its employees. Genesco controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Genesco common stock during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Genesco and their families and affiliates.

54. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Genesco has more than 22.7 million shares of stock outstanding, owned by thousands of persons.

55. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    Whether the 1934 Act was violated by defendants;

    (b)    Whether defendants omitted and/or misrepresented material facts;

    (c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)    Whether the price of Genesco common stock was artificially inflated; and

    (f)    The extent of damage sustained by Class members and the appropriate measure of damages.

56. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

57. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 5, 2007

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT, #2672
DOUGLAS S. JOHNSTON, JR. #5782
TIMOTHY L. MILES, #21605

GEORGE E. BARRETT

217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES BERNARD M.
GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Genesco.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

RICK ROEGLIN ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 5/22/07 | 50 | $50.95 |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| still holding | | |
| | | |
| | | |

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

GENESCO

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ____ day of _December_, 2007.

_____
RICK ROEGLIN

- 2 -

GENESCO